AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court
## District of Delaware

In the Matter of the Search of:                :

PREMISES LOCATED AT                            :        APPLICATION AND AFFIDAVIT
                                                        FOR SEARCH WARRANT
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Wilmington, Delaware.                          :
                                                        Misc. No. 05 - 36 M
                                               :

**REDACTED**

I, Stephen Nagy, being duly sworn, depose and say:

I am a(n) **Special Agent of the Diplomatic Security Service** and have reason to believe that

___ on the person of or **x** on the property or premises known as (name, description and/or location)

   See paragraph four of the Attached Affidavit,

in the District of _____ Delaware _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

   See Attachment A to the Attached Affidavit,

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rule of Criminal Procedure)
property that constitutes evidence, fruits and instrumentalities of the commission of offenses in violation of 18 U.S.C. §§1028, 1028A, 1341, and 287, and 26 U.S.C. §7206(2).

The facts to support a finding of Probable Cause are as follows:

   See attached affidavit of Stephen Nagy.

Continued on the attached sheets and made a part hereof.   **X** Yes   ___ No

                                        _____
                                        Signature of Affiant
                                        SA Stephen Nagy, DSS, U.S. DOS

Sworn to before me, and subscribed in my presence
**March 10, 2005**                             at    **Wilmington, Delaware**
Date                                                 City and State

Honorable Mary Pat Thynge
United States Magistrate Judge                       _____
District of Delaware                                 Signature of Judicial Officer
Name and Title of Judicial Officer

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF DELAWARE

IN THE MATTER OF THE SEARCH OF :
[REDACTED], : Misc. No. 05-36M
Wilmington, Delaware :

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Stephen Nagy, having been duly sworn, depose and state as follows:

    1.    Your affiant is a Special Agent of the Diplomatic Security Service (DSS), having been so employed by the U.S. Department of State since April of 2003. Your affiant is presently assigned to the Washington Field Office. I am a graduate of the Criminal Investigative Training Program at the Federal Law Enforcement Training Center in Glynco, GA, and I have received additional training from the Diplomatic Security Training Center in Dunn Loring, VA, to include specialized training on passports, visas, and other travel and identification documents. I am assigned to investigate criminal violations of matters relating to the U.S. Department of State in the United States and abroad, including passport and visa fraud, illegal, improper use, possession, and trafficking of identification documents, and false statements made to illegally obtain passports and visas.

    2.    Over the course of my investigation I have obtained probable cause to believe that Andres RODRIGUEZ is fraudulently selling identification documents. This affidavit is made in support of an application for a Search Warrant for the residence of Andres RODRIGUEZ, located at [REDACTED], Wilmington, Delaware 19805, as more particularly described in paragraph four, to seize evidence of violations of Title 18 U.S. Code, Sections 1028 (Fraud related activity in connection with identification documents), 1028A (aggravated identity theft), 1341 (Fraud related to the U. S. Mails), 287 (False Fictitious or Fraudulent Claims) and Title 26 U.S. Code, Section 7206(2) (fraud and false statements). The items to be seized are more particularly described on Attachment A.

    3.    Because this affidavit is for the purpose of establishing probable cause, it is not intended to include each and every fact or matter known to the government. I am personally familiar with the facts and circumstances surrounding this investigation both from my own investigative activity and from information obtained from other law enforcement officers, including other Special Agents of the DSS, Inspectors of the U.S. Postal Service (USPS), Postal

Inspection Service, and Special Agents of the U.S. Department of Treasury, Internal Revenue Service (IRS), Criminal Investigation, who have communicated the results of their investigation to me.

## PROPERTY TO BE SEARCHED

4.  The property commonly known as [REDACTED], Wilmington, Delaware 19805, is located on the South side of West 2nd Street, the front door facing north. The residence is a yellow row home structure, consisting of three stories and a basement. The property has a white front north-facing door with no visible house number. There are two windows to the left of the front door of the house.

## DETAILS OF INVESTIGATION

5.  On or about April 13, 2004, DSS agents interviewed a Confidential Informant (CI) who related that he/she had purchased fraudulent identification documents in the form of a Puerto Rico birth certificate and a Social Security Administration card, to allow the CI to fraudulently apply for a U.S. passport. The CI admitted to purchasing the documents for $800.00 USD from an individual in Wilmington, Delaware. The CI further identified this person as Andres RODRIGUEZ. The CI stated that RODRIGUEZ resided at [REDACTED], Wilmington, Delaware. The CI agreed to introduce a DSS Special Agent, acting in an undercover capacity (hereafter referred to as "DSS UC"), to RODRIGUEZ.

6.  On or about May 24, 2004, a recorded consensually monitored phone call was placed by the CI to RODRIGUEZ to introduce the DSS UC. RODRIGUEZ agreed to a meeting.

7.  The phone conversations and meetings described in subsequent paragraphs, between DSS Special Agent Maurilio Rojano-Garcia (DSS UC) and the individual identified as Andres RODRIGUEZ and others, were consensually recorded.

8.  On or about May 27, 2004, the DSS UC met RODRIGUEZ at the McDonalds Restaurant on 4th Street in Wilmington, DE (hereafter referred to as McDonalds). The DSS UC, describing himself to RODRIGUEZ as an illegal alien, expressed interest in obtaining identification documents in a different identity for himself and one other individual for the purpose of establishing a non-alien identity. The DSS UC and RODRIGUEZ discussed the type and price of documents RODRIGUEZ could supply. RODRIGUEZ showed DSS UC a copy of a Delaware driver's license in the name of Ricardo David LOPEZ, birth date ███████ bearing RODRIGUEZ's photograph, and stated that LOPEZ is the name that he works under. RODRIGUEZ stated that DSS UC could buy two sets of documents (each set consisting of a Puerto

1

Rico birth certificate and corresponding a social security card) for $1,300.00 USD for each set of identity documents. Later in the day the DSS UC met RODRIGUEZ at the same location and purchased the two sets of identity documents from RODRIGUEZ. The DSS UC provided $2,300.00 USD at that time and set a meeting to pay RODRIGUEZ the additional $300.00 USD at a later date.

9. On or about June 27, 2004, the DSS UC phoned RODRIGUEZ to arrange the purchase of additional identity documents. RODRIGUEZ stated that he was in Puerto Rico at the time and was in the process of acquiring documents. DSS UC placed an order for a birth certificate and social security card for a 16-year-old female.

10. On or about July 13, 2004, the DSS UC phoned RODRIGUEZ concerning the documents for the 16 year old. RODRIGUEZ indicated the documents were to be sent via the mail from Puerto Rico to Wilmington. On or about July 14, 2004, the DSS UC again phoned RODRIGUEZ, who stated that the documents were to be sent via express mail and that he should have them by Saturday, July 17. Also on or about July 17, U.S. Postal Inspector Keith Salter, posing as a U.S. Postal Mail Carrier, delivered an express mail item from Puerto Rico to Andres Rodriguez addressed at [REDACTED], Wilmington, Delaware.

11. On or about July 19, 2004, RODRIGUEZ phoned DSS UC and stated that the package had arrived on Saturday. A meeting was agreed upon for Tuesday, July 20, 2004.

12. On or about July 20, 2004, the DSS UC and RODRIGUEZ met at McDonalds. RODRIGUEZ supplied a set of documents consisting of a Puerto Rico birth certificate and a social security card, both under the same name. The DSS UC paid RODRIGUEZ $1,300.00 USD for the documents. Additionally, RODRIGUEZ showed the DSS UC four additional documents, two birth certificates and two social security cards. Each birth certificate and social security card set was under one name. In the course of the sale of the documents from RODRIGUEZ to DSS UC, RODRIGUEZ also showed DSS UC a U.S. Postal Service (USPS) Express Mail envelope that he stated the documents arrived on Saturday, July 14, 2004. RODRIGUEZ further stated that he had additional documents being sent to him from Puerto Rico that should be arriving via express mail. RODRIGUEZ agreed to provide the two sets of documents to the DSS UC to show to prospective buyers.

13. On or about July 22, 2004, Agent Salter was notified by the Wilmington Post Office, Lancaster Avenue Station, that a priority mail item had arrived for [REDACTED], Wilmington, Delaware, from Caguas, Puerto Rico. It was addressed to RODRIGUEZ. The document had no bulk to it, but it was possible to feel small flat content within, approximately 4" x 8" in size. Within that area, it was possible to feel smaller in shape items bearing the size of laminated drivers licenses, Resident Alien Cards, and Social Security Cards. Agent Salter indicated that the feel and size of the contents were consistent with documents discovered during pervious investigations

2

involving smuggling of identification documents. The item was delivered on or about July 23, 2004, to [REDACTED].

14. On or about November 19, 2004, the DSS UC phoned RODRIGUEZ and told him that he had sold the documents that were supplied on July 20, 2004, and that he would call back to set a meeting in which to pay RODRIGUEZ for the documents.

15. On or about December 2, 2004, the DSS UC phoned RODRIGUEZ and they agreed to meet the same afternoon at McDonalds. During the meeting the DSS UC paid RODRIGUEZ $2,600 USD for the two sets of documents described in paragraph 10. RODRIGUEZ told DSS UC that he was traveling to Puerto Rico to gather a number of documents in preparation for tax season. RODRIGUEZ further stated that he has a safe in his residence (which is known to agents to be at [REDACTED] in Wilmington) which is bolted to the floor. He implied that the safe is where he stores valuables, including the documents.

16. During the December 2, 2004 meet, Rodriguez stated that he does both federal and state income tax returns. According to Rodriguez, all an individual needs is a Form W-2. Rodriguez completes the tax returns and the client signs the return. Rodriguez stated that he does not sign as the preparer on the tax returns. Rodriguez stated that depending on how much a person makes, he can determine how much of a refund he can get them. At this same meeting, Rodriguez stated that "everyone charges" for tax preparation, but they'll do it legally. Rodriguez went on to explain that, "I'll do it illegally" by giving false dependents to his clients. Rodriguez stated that the main purpose of the purchased social security cards was for work (to prepare tax returns) not for identification.

17. On or about January 14, 2005, the DSS UC phoned RODRIGUEZ and they talked about meeting in the near future to discuss the purchase of additional identity documents. RODRIGUEZ stated that he had returned from Puerto Rico with one social security card and one complete set of documents. On or about February 14, 2005, the DSS UC again phoned RODRIGUEZ and they agreed to meet in one week's time.

18. On or about February 22, 2005, the DSS UC phoned RODRIGUEZ and they arranged to meet later that afternoon. DSS UC also informed RODRIGUEZ that he had a friend who might be interested in renting a room in RODRIGUEZ's home, a room which RODRIGUEZ had offered to DSS UC in a previous meeting. That afternoon, the DSS UC and his "friend" (a USPS Postal Inspection Service Inspector acting in an undercover capacity, hereafter referred to as "USPS UC") met RODRIGUEZ at his residence ([REDACTED]). While receiving a tour of the home by RODRIGUEZ, the USPS UC asked RODRIGUEZ if he would be able to use a computer should he agree to rent a room. RODRIGUEZ responded that he does have a computer, and added that he uses the computer to make airline reservations for his travels to and from Puerto Rico.

3

19. During their conversation, the DSS UC indicated that his buyer needed one (1) birth certificate and six (6) social security cards and inquired whether it would be possible for RODRIGUEZ to supply the documents in the upcoming days. RODRIGUEZ indicated that did not have that many documents on hand and he would have to check. RODRIGUEZ then examined his desk and went upstairs. He then showed some documents to the DSS UC. At approximately 15:23, RODRIGUEZ then placed a phone call from his cellular phone in the presence of the DSS and USPS UCs. In the process of placing the cellular phone call to another individual (previously described by RODRIGUEZ as an associate in Puerto Rico), RODRIGUEZ held out his cellular phone to show phone's display to the DSS and USPS UCs. The cellular phone display showed a phone entry listed as "Paper." RODRIGUEZ proceeded to hold a conversation with his "associate" in Puerto Rico and asked if it would be possible to mail two social security cards that same day. Following the phone conversation RODRIGUEZ indicated that his contact stated he would be able to mail the two social security cards within a few days. RODRIGUEZ told the DSS UC that he could provide all the requested identity documents for a total price of $4,550 USD. RODRIGUEZ agreed to contact DSS UC when the documents were ready. RODRIGUEZ further stated at this meeting that he planned to travel to Puerto Rico in the upcoming days for the purpose of obtaining additional sets of identity documents.

20. A query of law enforcement indices showed that RODRIGUEZ had flight reservations with U.S. Airways for a travel itinerary for departure from Philadelphia, PA to San Juan, PR on March 1, 2005, with a return flight to Philadelphia on March 8, 2005.

21. Over the course of this same February 22nd meeting, RODRIGUEZ told the DSS and USPS UCs that he makes more money with tax preparation than with the sale of social security cards. RODRIGUEZ went on to say that he usually starts preparing returns from March 15 until April, but started this year on January 15th. RODRIGUEZ claimed to have made approximately $20,000 this year from tax preparation. RODRIGUEZ explained that his clients bring him their Form W-2s and then he completes the tax return for them. He further stated the records are maintained in his room at his residence at [REDACTED] Wilmington, DE. RODRIGUEZ stated that he is the only one that maintains the tax returns he prepares. He does not give his clients a copy of their tax returns. RODRIGUEZ explained that by him keeping a copy of the tax returns, he maintains the records of which dependents are claimed by each client. Both the DSS UCC and the US Postal UC observed tax "packets" inside [REDACTED].

22. RODRIGUEZ further stated that the tax returns are processed at Michael's, known to the Affiant as Michael Eller Tax Service based on independent information obtained from IRS Special Agent Melissa Marsh. RODRIGUEZ stated that he prepares the returns, takes them to Michael's, and picks up the refund checks from Michael's for his clients. Additionally, RODRIGUEZ stated that he can call Michael Eller Tax Service and give them information such as client name, amount of wages, employer identification, so that the tax return may be processed. RODRIGUEZ stated that he knows someone there (Eller Tax Service). RODRIGUEZ did not state the identity

of this person. Michael's charges a $205 fee for processing, which RODRIGUEZ pays.

23.  Agent Marsh also conveyed the following information to your Affiant. An individual that had a business relationship with Michael Eller Tax Service supplied information to IRS agents that on a half a dozen occasions, he saw RODRIGUEZ at Michael Eller Tax Service dropping off Form W-2 information and picking up refund checks that were made payable to various clients. This individual also identified RODRIGUEZ photograph when shown to him. This individual knows RODRIGUEZ only as "Ricardo". This individual is previously known to IRS agents from another investigation.

24.  On several occasions, RODRIGUEZ told the DSS UC that he stores illegal documents and financial documents in a safe within the [REDACTED] and elsewhere in the house.

25.  Your affiant knows from training and experience that individuals using or providing fraudulent identification documents often maintain these documents on computers and computer equipment. Those involved in such fraudulent activities also commonly maintain address or telephone numbers in books or papers, and other documentation and records, which reflect names, addresses and/or telephone numbers of their associates, customers, and/or contacts who assist in obtaining fraudulent documents.

26.  Based on these facts, your affiant believes that probable cause exists that Andres Rodriguez is committing identify card trafficking offenses, in violation of Title 18 United States Code, Sections 1028, 1028A, 1341, 287, and that probable cause exists to believe that evidence of such offenses are contained within the premises at [REDACTED], in Wilmington, DE. Your affiant has been further advised by Agent Marsh that based on information known to her and set forth above, probable cause exists to believe that Andres Rodriguez is committing offenses in violation of and Title 26 United States Code, Section 7206(2) (fraud and false statements in connection with the preparation and submission of tax returns) and that probable cause exists that evidence of such violations are contained within [REDACTED], Wilmington, DE.

27.  Your Affiant is aware that the third floor of the premises to be searched are leased to individuals not the target of this investigation. Your Affiant is also aware that other rooms within the premises may be leased to other individuals, but cannot identify those rooms at this time.

///

28. WHEREFORE, based on the foregoing, your Affiant respectfully requests that this Court issue a warrant for the search and seizure of items listed on Attachment A contained within ███████████, Wilmington DE, as more particularly described above.

Your Affiant, having signed this Affidavit under oath, as to all assertions and allegations contained herein, states that its contents are true and correct to the best of his knowledge, information and belief.

_____
SA Stephen Nagy
Diplomatic Security Service
U.S. Department of State

Sworn to and subscribed before
Me this 10th day of March, 2005.

_____
Honorable Mary Pat Thynge
United States Magistrate Judge
District of Delaware

6

# ATTACHMENT A

## ITEMS TO BE SEIZED

A. All identification documents including birth certificates, social security cards, driver's licenses, identification cards, passports of any nationality, visas, travel documents, petitions, applications, forms, letters, stationary, proof of citizenship or nationality, or identification photographs;

B. All documents relating to the purchase, transfer or creation of any means of identification (real or fictitious).

C. All financial accounts statements, bank statements, deposit slips, withdrawal slips, cancelled checks, bank checks, money orders, wire transfer records, passbooks, loan documents, credit card records, statements, receipts, payment records, and documents evidencing the acquisition, concealment, conversion, transfer, and expenditure of money or assets.

D. All records of loans, credit cards accounts, and any other records of purchase and/or financing of assets, living expenses, expenditures, and business expenses.

E. Correspondence, records, receipts, notes and ledgers, address books, rolodexes, diaries, books, calendars, lists, and papers reflecting names, addresses, social security numbers, telephone numbers, cellular phone numbers, fax numbers, pager numbers, and email accounts. To include all documents reflecting the names of individuals, businesses, possible participants, creditors, financial institutions, personal aliases, corporate entities, shell corporations, business fronts, partnerships, relatives, associates, and nominees, as well as documents reflecting assets purchased and with whom a financial relationship exists.

F. All federal and state tax returns, forms and schedules, including Forms 1040 and Forms W-2.

G. All tax records, books and records, tax forms, Forms W-2, Forms 1099, Forms 1098, filing instructions, workpapers, schedules, notes, lists, financial statements, receipts, invoices, correspondence, and income tax return checks.

H. All records and financial documents relating to tax liabilities, filing status, dependents, income earned, business income, expenses, deductions, business endeavors, assets, liabilities, and expenditures.

I. All records of Post Office boxes, safe deposit boxes, safe deposit box keys, contracts, agreements proposals, and documentation evidencing the acquisition, concealment, transfer, and expenditures of money or assets.

7

J. All travel records including airline or other travel conveyances, vehicle rental and lodging receipts, itineraries, tickets, reservation documents, or boarding passes.

K. All records of occupancy, residency or ownership of property, including utility and phone bills, mortgage, deed and lien records, rental agreements, canceled mail and keys.

L. Encoding Machines and related encoding equipment.

M. To open any door, lock, safe, lock boxes or receptacle where evidence could be hidden.

N. Computers, diskettes, CD ROMS, Fax machines, cellular phones, caller ID terminals, embossing machines, pagers, and cellular phones. <u>Such items may be seized but not searched without further approval of the Court</u>.